Paul LILLY, individually and on behalf of all others similarly situated, Plaintiff,

and

Christopher McKinney; Philip Reed; John Legrand; Ken Bailey; Frank Sullivan; James Mobley; Shirley Gatewood; Jerome Gary; Curtis Jones; Woodrow McManus; Roy Torrence; Hazel Fisher; John Johnson; Willie Hunt; Michael McVay; Roosevelt Patterson; Willie Covington; William Carrothers; Tresevant Goodwin and Richard Burch, individually and on behalf of all others similarly situated, Plaintiffs-Intervenors,

v.

HARRIS–TEETER SUPERMARKET, a corporation, Defendant.

Richard GREGORY, individually and on behalf of all others similarly situated, Plaintiff,

v.

HARRIS–TEETER, a corporation, Defendant.

Edward PORTER, Plaintiff,

v.

HARRIS–TEETER, a corporation, Defendant.

Nos. C–C–76–191–M, C–C–79–130–M and C–C–79–137–M.

United States District Court, W.D. North Carolina, Charlotte Division.

Oct. 10, 1986.

Michael A. Sheely, Charlotte, N.C., for plaintiffs.

John O. Pollard, Blakeney, Alexander & Machen, Charlotte, N.C., for defendant.

McMILLAN, District Judge.

This case was tried to the court sitting without a jury. The court issued a memorandum of decision finding in favor of certain plaintiffs and against certain plaintiffs on the merits. *Lilly v. Harris-Teeter Supermarket*, 503 F.Supp. 29 (W.D.N.C.1980). Detailed findings of fact, conclusions of law and a final judgment were filed on July 13, 1982. 545 F.Supp. 686 (W.D.N.C.1982). Defendant appealed, and the decision of this court was affirmed in part and reversed in part in an opinion which appears at 720 F.2d 326 (4th Cir.1982).

The Court of Appeals:

1. Affirmed the decision of this court in favor of the plaintiffs Lilly, Gregory and Porter;

2. Affirmed the action of this court in denying relief to all plaintiffs as to whom this court denied relief;

3. Remanded the case for reconsideration of the decisions which this court had made in the claims of the following persons for denial of *promotion* upon racial grounds: James Mobley; Philip Reed; Jerome Gary; Christopher McKinney; Roy Torrence; Roosevelt Patterson;

Curtis Jones; Frank Sullivan; Ken Bailey and John LeGrand; and

4. Remanded the case for reconsideration of attorney fees.

The court has re-examined the claims of the ten persons who were found to have been denied *promotion* upon racial grounds.

The findings of this court on the promotion claims did not rely and do not rely upon the probative effect of the statistical analyses, regression or otherwise, of the experts who testified. The decision as to each employee is based upon

(a) The specific practices of the defendant, shown abundantly by the evidence, which are set out on page 30 of the original memorandum of decision, 503 F.Supp. 29 (W.D.N.C.1980), as follows:

The particular practices which effectuated discrimination against black employees are the following:

1. Jobs were not posted.

2. Written job descriptions were not available.

3. There was no written promotion system.

4. There were no written promotion criteria.

5. There was no requirement nor suggestion that an employee ask for a particular job in order to be considered for it.

6. There were no written job evaluations for warehouse workers.

7. No written list was maintained of employees wanting to change to other or better jobs; only a "mental" list was kept by foremen and supervisors of persons who may have shown interest in a particular job.

8. Requirements for "lead" jobs included the following:

(a) Correct "attitude";

(b) Initiative; an employee must not only excel in his job but *say* he wanted to get ahead (this requirement of "speaking up" was never publicized).

9. Promotions were available only within the same shift (with exceptions for various whites).

10. Promotions were available only within the same department (with exceptions for various whites).

11. Refusals by blacks to take jobs on particular occasions, regardless of circumstances, were carefully remembered, but such blacks were never asked whether they had changed their minds.

12. Previous job experience was not systematically recorded. Relevant job experience of blacks not noted on the application form was deemed not to exist; however, word of mouth information about the job experience of whites was remembered.

As usual, statisticians testified on both sides of the case. Statisticians for the plaintiffs selected data and made comparisons which generally support the plaintiffs' contentions, and statisticians for the defendant testified generally about other figures and opinions which support the position of the defendant. To a tremendous extent the opinions were determined by the choices of samples and the elements of the labor market and the employer's work force which were compared with each other. The statistical evidence generally shows about what the raw data shows—that blacks had less chance of getting good jobs than whites and less chance of getting promotions than whites.

(b) The detailed evidence about the treatment of each individual plaintiff, as summarized in the original memorandum of decision and in the findings of fact and conclusions of law in 545 F.Supp. 686, at 691–698 (W.D.N.C.1982).

No presumption, statistical or otherwise, was entertained that plaintiffs who sought promotions would probably win. Three persons who sought promotions (plaintiff Mack Ervin, plaintiff Woodrow McManus and plaintiff Richard Burch) were denied promotion even though they had *prima facie* proof, for the reason that the court was not persuaded that race played a moving part in the employment decisions affecting them. The "ADDITIONAL FINDINGS OF FACT AND CONCLUSIONS OF

LAW" dated June 17, 1981 (document number 23), contain the following specific findings as to Mack Ervin, Woodrow McManus and Richard Burch:

### III. *Mack Ervin.*

Mack Ervin claimed that he was paid less than a white employee performing the same job as he. His testimony in support of his claim was inconsistent with his own exhibits consisting of extracts from personnel files.

Although Ervin claimed that a white employee, Strann, received five cents more per hour than Ervin received when raises were given on May 3, 1976, the personnel files showed that Ervin was classified as a picker on May 3, 1976 rather than as a lift operator. Strann's personnel file shows that Strann had been classified as a lift operator since November 11, 1974. The documents are more credible evidence than Ervin's unsupported assertions. Ervin did not show that he was performing the same duties as Strann.

\*     \*     \*     \*     \*     \*

### VIII. *Woodrow McManus.*

McManus was hired in September 1974, as an order puller (selector) in the warehouse. During the course of his employment McManus took courses in computer programming at Central Piedmont Community College. McManus testified that prior to the completion of his studies, he saw a notice on the employee bulletin board of an opening for an RPG Programmer within the defendant's computer department. He said that he applied for the position of RPG Programmer but was advised he would not be selected because he had no experience.

Documentary evidence showed that there were three programmers in the computer department in mid–1975. The first available opening for a programmer came in October 1976, and it was filled from within by promoting a black computer operator into the position. There were no openings for a programmer at the time McManus said he applied. The company had never used the computer language referred to in the "RPG" designation and had never advertised such a position. McManus failed to establish a *prima facie* case, and, even if he did, defendant's evidence provided ample rebuttal.

\*     \*     \*     \*     \*     \*

### X. *Richard Burch.*

Burch was hired on February 9, 1976, as a wash man. He is still employed by the company.

Burch claimed that he was not permitted to enroll in a truck driver training program because of his race.

Some time after August 1976, Burch requested that he be placed in the training program. He was placed on a list of individuals to be trained. In November 1976, Burch joined a strike against the company and did not return until August 29, 1977.

In 1976, as a result of a grievance filed on his behalf by the union, Burch was given a driver road test to determine whether he was qualified to operate a tractor-trailer unit. The test was administered by Marshall Little, a black supervisor in charge of driver training. Little determined that Burch was not qualified.

Prior to the strike by employees in November, 1976, the company did have a driver training program which was suspended during the course of the strike. At the time of trial, the program had not been reinstated, but a proposal for its reinstatement had been submitted to the union pursuant to the company's collective bargaining obligation.

Burch failed to establish that between the time of his request and the beginning of the strike any white employees were accepted for the training program who were less qualified than Burch. Burch's race did not play a part in his inability to obtain a position within the training program.

The other seven plaintiffs (Hazel Fisher, Shirley Gatewood, William Carrothers, Barbara Anderson, Austin Pharr, Tresevant Goodwin and Therrell McMoore) (asserting claims other than promotion) were expressly found by the court, on conflicting evidence, *not* to be entitled to recover on matters like discharge, maternity leave, un-

equal pay, denial of re-hire and discharge for errors in production.

If the court had been proceeding in fact upon a presumption based upon statistics, it might well have found in favor of those seven plaintiffs.

In the cases of every one of the ten plaintiffs whose promotion claims were allowed, it was the finding of this court that, on the facts of each individual case, the plaintiffs were entitled to recover. The court was satisfied from the *ad hoc* evidence as to each particular plaintiff that the reasons stated by the defendant were pretextual.

I have photographed, and there appear in parallel columns below, copies of the specific findings as to each of those ten plaintiffs as those findings appear (left hand column) in the original memorandum of decision, 503 F.Supp. 30–32, and as they appear (right hand column) in the final order and judgment, 545 F.Supp. pp. 710–714.

### 503 F.Supp. 29, et seq.:

*James Mobley.*—James Mobley, a lead man in the milk-dairy-meat departments, was denied several promotions which went to white employees (Terry Givens, Allison and Jeff Fowlkes), all of whom were junior to him. Although Mobley went on strike in the winter of 1976–77, he was available to work by February of 1977 and notified his employer of his availability and willingness at the times that the other three men were promoted.

### 545 F.Supp. 686, et seq.:

*James Mobley* has proved a *prima facie* case in that he was qualified for promotion, there were vacancies, he was not promoted, and whites were promoted. See e.g. *Higgins v. State of Okla. Ex. Rel. Okl. Emp. Sec.*, 642 F.2d 1199, 1201 (10th Cir. 1981). Harris-Teeter stated that the promotees were more qualified, Mobley was on strike when Allison was promoted, and Mobley was in a different department/shift. *Standing alone*, each reason is legitimate and non-discriminatory. Considering all of the evidence, said reasons are pretextual. Mobley was more qualified than the promotees because of his job experience, including "fill-in" leadman duties and performance. He was never considered for the Allison and Givens leadman openings. Allison was promoted some 8 weeks *after* Mobley informed the company that he was available for work. The same shift/same department defense for not promoting Mobley to the "defacto leadman" position of Jeff Fowlkes is invalid because of the way the practice was applied, and the adverse impact of said application upon blacks. See Finding 16. Finally, this conclusion is supported by the nature of the promotion system at Harris-Teeter and its adverse impact upon blacks. Mobley was denied promotions received by Givens, Allison, and Fowlkes because of his race.

*Philip Reid [Reed].*—Philip Reid applied in April of 1976 for a job as a produce manager. He was hired as a produce clerk but was never promoted to manager. White persons who were promoted ahead of him but were no better qualified were Andy Wilson and Warren Allen. He is entitled to compensation for being denied *promotion* to produce manager because of his race. His *discharge*, however, I do not find to be the result of racial discrimination.

*Philip Reed* established a *prima facie* case when he showed that he applied for the position of produce manager twice, that he was qualified, that vacancies existed, and that less qualified whites were selected. Defendant's stated reasons were that the selectees were more qualified and that there was no vacancy. These reasons, *standing alone*, are legitimate, non-discriminatory reasons. Considering all of the evidence, defendant's reasons are pretextual. There were vacancies. Reed had more retail grocery management experience and was more qualified than the promotees. Harris-Teeter was aware of this experience but ignored it, just as it did with other black employees. See Find-

ing 19. Reed was never considered for either position. The statistics show that 104 whites and 4 blacks were promoted to store management positions in 1975–76. Reed was affected by the discriminatory nature of the promotion system. Reed was denied the promotions received by Allen and Wilson because of his race.

*Jerome B. Gary.*—Jerome Gary, a fork lift operator and stocker with two years of work as an automobile mechanic and auto body worker, was denied opportunity because of his race to transfer to a mechanic's job. Two white employees (Burris and Richards) were allowed to transfer. Gary was also for the same reason denied transfer to a "sit down" lift truck operation although white employees were allowed to make that transfer.

*Jerome Gary* has proved a *prima facie* case by showing that he was neither promoted nor transferred; he sought the positions; there were vacancies; he was qualified; and, whites received said positions. Harris-Teeter's reasons for neither promoting Gary (not qualified) nor transferring (never asked) standing alone, are legitimate, non-discriminatory. Considering all of the evidence, said reasons are pretextual. The Court resolved the credibility issue of whether Gary asked for the sitdown lift in favor of Gary. In reference to the mechanic's position, Gary was more qualified than the selectees because of his education and job training. The statistical evidence in Finding 26 also supports this conclusion. Finally, this conclusion is supported by the nature of the promotion system at Harris-Teeter and its adverse impact upon blacks. Gary was denied a transfer to the sitdown lift and a promotion to mechanic because of his race.

*Christopher McKinney.*—This plaintiff started to work June 18, 1975, in the Harris-Teeter warehouse as a lift truck operator, and his duties have not changed since that time. He had previous experience as a line foreman, supervising several machine operators. He sought promotion to lead man or foreman but the jobs were given to Guy Fowlkes and to Weaver. Fowlkes, though not formally appointed lead man, was given the duties of a lead man in the fall of 1976 before the 1976–77 strike and was made a management trainee and foreman in 1977. Weaver was hired during the strike and was junior to McKinney in experience and qualifications. McKinney was denied the jobs because of his race.

*Christopher McKinney* has proved a *prima facie* case in that he was qualified for a promotion, there were vacancies, he was not promoted, he expressed an interest in promotion, and whites were promoted. Harris-Teeter stated that it did not promote McKinney because he was not qualified, and he was on strike when the positions were filled. *Standing alone,* each reason is legitimate and non-discriminatory. Considering all the evidence, said reasons are pretextual. A Harris-Teeter witness testified that McKinney was not qualified because of his poor work record and that persons received warnings when they had a poor work record. McKinney did not have any warnings. McKinney was more qualified than either promotee because of his greater departmental and supervisory experience. McKinney informed Harris-Teeter of his availability for employment before either position was filled. McKinney worked in the same department and on the same shift as each of the openings. Each promotee crossed either a departmental or shift line to receive the promotion. This violated the same shift/deparment rule. Finally, this conclusion is supported by the nature of the promotion system and its adverse impact on blacks. McKinney was denied the promotions received by Fowlkes and Weaver because of his race.

*Roy Torrence.*—Torrence, hired in 1974, had owned and supervised a restaurant for eight or nine years. He was qualified for promotion to lead man or foreman. He had supervised a number of employees in a previous job. A white employee (Mitchell) was trained by him and was then promoted over him. A white employee (Hanson), junior to him and no better qualified, was promoted over him. He was denied promotion because of his race.

*Roy Torrence* has proven a *prima facie* case in that he was qualified for promotion, he expressed interest in promotion, he was not promoted, there were vacancies, and whites were promoted. Harris-Teeter stated that it did not promote Torrence because he did not ask for a position, and he was a poor employee. *Standing alone*, each reason is legitimate and non-discriminatory. Considering all of the evidence, said reasons are pretextual. Torrence asked for a promotion. He was told he would never be promoted. Torrence was rated as an excellent employee. He had prior supervisory experience. He was never considered for the Mitchell position. He was more qualified than either of the promotees (Mitchell, Hanson). He trained Mitchell. The criteria utilized in the Hanson promotion were subjective. Finally, the conclusion is supported by the nature of the promotion system and its adverse impact upon blacks. Torrence was denied promotion to the positions received by Mitchell and Hanson because of his race.

*Roosevelt Patterson.*—Patterson worked for Harris-Teeter during large parts of 1972 and 1973 and since October 1973 has worked continuously for Harris-Teeter. Since March of 1974 he has been a lift driver on the day shift. He wanted to become receiver and in fact worked the job full time for a week or more, but was not paid a receiver's wages. Numerous whites junior to him were promoted over him. These included David Allison, Jeff Fowlkes and Terry Givens. Patterson was denied promotion because of his race.

*Roosevelt Patterson* has established a *prima facie* case in that he was qualified for various promotions, he was not promoted, he asked to be promoted, there were vacancies, and whites were promoted. Harris-Teeter stated that it did not promote Patterson because he left a position, he was not in the same department or on the same shift as the openings, he was not qualified, and he was on strike when the positions were filled. *Standing alone*, each reason is legitimate and non-discriminatory. Considering all of the evidence, each reason is pretextual. Patterson was more qualified than the promotees. Patterson left the receiver's job because he was denied assistance. The record evidence shows that generally 2 whites performed this job and Patterson performed it alone. He was never considered for any of the promotions. The same shift/same department rule is pretextual. See Finding 16, *supra*. Patterson was qualified for said positions because of his experience and performance. The positions were filled either before Patterson went on strike or after he notified the employer he was available for work. Finally, the nature of the promotion system and its impact upon blacks supports this conclusion. Patterson was denied the positions listed in Finding 29 because of his race.

*Curtis Jones.*—Jones has been a salvage worker since July 1974. He sought the job of rail dock worker from his supervisors, Dick Jackson and John Watson. Several whites, James Lamb, Eddie Kistler and Neal Mitchell, all junior to him, were hired into that job ahead of him. He was denied promotion because of his race.

*Curtis Jones* established a *prima facie* case in that he asked for the position of rail unloader twice, he was qualified, he did not receive said position, there were vacancies, and whites were hired. Harris-Teeter stated that it did not promote Jones because of his back problem. Said reason, *standing alone*, is legitimate and non-discriminatory. Considering all of the evidence, the reason is pretextual. His back problems were minor. The supervisor never asked him about the problem. He was transferred to the salvage dock where the items he moved were similar in size to those moved by a rail unloader. In 1976 Harris-Teeter hired seven whites and no blacks in loader/unloader positions. Jones was more qualified than the hirees. Finally, this conclusion is supported by the nature of the promotion system and its adverse impact on blacks. Jones was denied the rail unloader positions because of his race.

*Frank Sullivan.*—Sullivan has been with Harris-Teeter for eleven years as collector and receiver. In July 1973 he became a *de facto* lead man. He did the job but was not given the pay raises which other lead men received. Mitchell, his supervisor, had made a public announcement to the day shift of the whole department of his promotion to lead man, but repudiated it the following spring. Sullivan was qualified to be lead man and was, in fact, a lead man for several months. George Hamilton and David Kiker were both junior to him but were promoted to lead men ahead of him. The reason given for depriving Sullivan of his *de facto* lead man job and pay was that two years earlier, immediately after he had gotten married, the employer had put him in a night program as foreman trainee and he had asked out of it because he had just gotten married. I do not find that two-year-old piece of history to be a valid reason for denying him promotion. He was denied promotion because of race.

*Frank Sullivan* proved a *prima facie* case by showing that he was qualified for various promotions, he was not promoted, there were vacancies, and whites were promoted. Harris-Teeter stated that it did not promote Sullivan because he left the foreman trainee program, was less qualified than the promotees, and was on a different shift than a vacancy. Each reason, *standing alone*, is legitimate and non-discriminatory. Considering all of the evidence, they are pretextual. Sullivan was more qualified than the promotees because of his experience, including that of leadman. His leaving the foreman training program as a defense is unworthy of credence. The same shift/department reason lacks credence. See Finding 16. Finally, the nature of the promotion system and its adverse impact on blacks supports this conclusion. Sullivan was denied the promotions received by Kiker and Hamilton because of his race.

*Kenneth Joe Bailey.*—Bailey is the chief steward on the day shift and a manager of the union negotiating committee. He started as a loader's helper in 1974, became a loader, and since April 27, 1974, has been a "stacker." He has three years of college. He filed grievances in connection with promotions to lead men of Richard McLain and Wade Carpenter, alleging racial discrimination. Bailey was qualified for the lead job Carpenter got and was senior to him. Participation in the strike was not fatal to the promotion of Carpenter (white). Bailey was denied promotion because of race.

*Kenneth Bailey* established a *prima facie* case in that he was qualified for promotions, there were vacancies, he was not promoted, and whites were promoted. Harris-Teeter stated that Bailey was not promoted because he was not as well qualified as the promotees. *Standing alone*, this reason is legitimate and non-discriminatory. Considering all of the evidence, said reason is pretextual. Bailey was more qualified than each promotee because he had greater departmental experience and performed a broader range of duties. Finally, this conclusion is supported by the nature of the promotion system and its adverse impact on blacks. Bailey was denied the positions received by McClain [McLain] and Carpenter because of his race.

*John Wallace LeGrand.*—LeGrand started work for Harris-Teeter in July 1974 as a picker in frozen foods. He was instructed to learn the job of an employee named Black so he could be a fill-in lead man and he became a fill-in lead man. He had had previous experience as a lead man and had told the manager about it when he came to work. He trained a white person named Avery to be lead man. The job was offered to Avery but was not offered to LeGrand. LeGrand, because of his race, was not considered for lead man jobs which were awarded to Douglas Dover, Terry Givens and Jeff Fowlkes.

*John LeGrand* established a *prima facie* case by showing that he was qualified for several promotions, there were vacancies, he was not promoted, and whites were promoted. Harris-Teeter stated that it did not promote LeGrand because he was on strike when Fowlkes was promoted; in a different department or shift than the vacancy, and less qualified than the promotees. *Standing alone*, each reason is legitimate and non-discriminatory. Considering all of the evidence, said reasons are pretextual. LeGrand was more qualified than the promotees because of his prior experience. He had more loading experience than Fowlkes. Fowlkes assumed the *defacto* leadman duties before the strike. The same shift/department reason is invalid for the reasons set forth in Finding 16. Finally, this conclusion is supported by the nature of the promotion system and its adverse impact on blacks. LeGrand was denied the promotions received by Fowlkes, Dover, and Givens because of his race.

---

The nature of the promotion "system" and its adverse impact upon blacks is mentioned as a consideration in the findings as to most if not all those plaintiffs. That "nature" is not statistics nor statistical opinion, but is twelve promotion practices which are quoted on page 3, above, and which were a central part of this court's original memorandum of decision (503 F.Supp. 29, at page 30, W.D.N.C. 1980).

*Statistical* opinions based on regression analysis or otherwise, were not and are not a "but for" factor in the judgment the court has made.

The finding that the promotion system as a whole was discriminatory against blacks in each of those cases was a cumulative but not a necessary part of the original determination.

The subjective criteria advanced by the defendant in support of the individual decisions against the ten plaintiffs were not, in fact, the true reasons for the decisions against those ten plaintiffs.

The case by case analysis which is directed by the Circuit Court in 720 F.2d 326 at 339 has already been done; the individual cases were decided by this court on individual bases; the statistics, whether expert or otherwise, were not relied upon by the court to create a presumption or to prove an unlawful intent in the promotion cases.

IT IS THEREFORE ORDERED:

1. That defendants shall afford to plaintiffs Lilly, Gregory and Porter the relief previously ordered.

2. That since this court has concluded that the original judgment should be reinstated, there does not appear to be any occasion to change the previous judgment, as far as it goes, with regard to attorney fees.

3. That the original judgment, as it appears on pages 715–721 of 545 F.Supp. 686 is hereby reinstated in all particulars.

4. That counsel for the plaintiffs will submit any appropriate petitions with regard to costs, fees and expenses.