Paul LILLY, individually and on behalf of all others similarly situated; Christopher McKinney; Phillip Reed; John Legrand; Ken Bailey; Frank Sullivan; James Mobley; Shirley Gatewood; Jerome Gary; Curtis Jones; Woodrow McManus; Roy Torrence; Hazel Fisher; John Johnson; Willie Hunt; Roosevelt Patterson; Willie Covington; William Carrothers; Tresevant Goodwin; Richard Gregory, individually and on behalf of all others similarly situated; Edward Porter; Michael McVay; Richard Burch, individually and on behalf of all others similarly situated, Plaintiffs-Appellees,

v.

HARRIS-TEETER SUPERMARKET, A Corporation, Defendant-Appellant.

No. 86-3157.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 2, 1987.

Decided March 29, 1988.

John Oliver Pollard (Blakeney, Alexander & Machen, Charlotte, N.C., on brief), for defendant-appellant.

Michael Anthony Sheely (Russell & Sheely, Concord, N.C., on brief), for plaintiffs-appellees.

Before WINTER, Chief Judge, SPROUSE, Circuit Judge, and HAYNSWORTH, Senior Circuit Judge.

SPROUSE, Circuit Judge:

Harris–Teeter Super Markets, Inc., appeals from the district court's decision that it discriminated against ten black employees in numerous promotion decisions, in violation of 42 U.S.C. § 1981, and 42 U.S.C. § 2000e *et seq.* (Title VII of the Civil Rights Act of 1964). This is the second time the district court has rendered judgment on the employees' claims; the district court's decision on appeal here came after our remand of the district court's first judgment. *Lilly v. Harris–Teeter Supermarket,* 545 F.Supp. 686 (W.D.N.C.1982), *aff'd in part, rev'd in part, and remanded, Lilly v.*

*Harris–Teeter Supermarket,* 720 F.2d 326 (4th Cir.1983), *cert. denied,* 466 U.S. 951, 104 S.Ct. 2154, 80 L.Ed.2d 539 (1984), *judgment on remand, Lilly v. Harris–Teeter Supermarket,* 645 F.Supp. 1381 (W.D.N.C. 1986). We now affirm in part and reverse in part on the individual claims of discrimination. We vacate the trial court's interim award of attorneys' fees to the plaintiffs and remand for a redetermination in light of today's decision.

#### I. Procedural Background

The history of this lengthy litigation has been thoroughly discussed in our previous opinion, 720 F.2d at 329–31, and we limit ourselves to a brief review.

Harris–Teeter is a North Carolina-based retail grocery chain with offices, retail stores, and a warehouse. Harris–Teeter discharged Paul Lilly, a black employee, in 1975. Lilly complained to the Equal Employment Opportunity Commission (EEOC), and he eventually alleged that Harris–Teeter engaged in classwide discrimination against blacks in hiring, promotions, terminations, and other employment practices. The EEOC issued a right-to-sue letter, and Lilly commenced the present action in June 1976.

In 1979, twenty other black employees intervened as named plaintiffs in Lilly's class action, and the case was also consolidated with that of two other black Harris–Teeter employees who were alleging racial discrimination. A bench trial was held in 1980, and the district court issued a decision outlining its preliminary findings. *Lilly v. Harris–Teeter Supermarket,* 503 F.Supp. 29 (W.D.N.C.1980).

After requesting proposed findings of fact and conclusions of law from the parties, the court entered a more detailed decision in 1982. *Lilly,* 545 F.Supp. at 686. The court denied certification for the claim of class-wide discrimination in hiring. It concluded, however, that Harris–Teeter engaged in a class-wide pattern of racial discrimination in both its promotions policy and its terminations policy.

The court also found that racial bias motivated Harris–Teeter's refusal to promote each of the ten employees who are parties to the present appeal. It ordered Harris–Teeter to undertake remedial steps and pay damages. The court subsequently entered an award of approximately $86,000 in interim attorneys' fees.

On the initial appeal, this court upheld the finding of a class-wide pattern of discrimination in Harris–Teeter's terminations policy regarding black employees. *Lilly*, 720 F.2d at 337. The proof of class-wide discrimination in promotions, however, was found insufficient. The evidence revealed an insignificant statistical disparity between the rate of black and white promotions in Harris–Teeter's work force during the relevant times. *Id.* at 338. Further, the plaintiffs had presented almost no direct evidence of racial discrimination. In light of these evidentiary inadequacies, we held that it was improper for the district court to infer class-wide discrimination in promotions merely from Harris–Teeter's use of subjective and vague criteria in its promotion decisions. *Id.*

This court then addressed the district court's individualized findings of discrimination in promotions against the ten plaintiffs in the case *sub judice. Lilly*, 720 F.2d at 338–39. We remanded these findings, in part because it appeared that the district court had relied on its earlier conclusion that the promotion system was, as a whole, discriminatorily applied as to blacks. This was a conclusion we had rejected. Since the district court had not indicated whether its class-wide conclusion "was a necessary, or merely a cumulative, piece of evidence" in deciding the individual claims, we requested the court on remand to determine "whether any or all of the individual claims are made out in the absence of proof of class-wide discrimination." *Lilly*, 720 F.2d at 338.

The remand was also necessary to permit the court to make "case-by-case findings as to the 'subjective' criteria advanced by Harris–Teeter as the basis for its promotion decisions." *Id.* In this regard, we stated that:

the premise that [Harris–Teeter's] subjective criteria were mere pretexts for racial discrimination cannot stand as an across the board conclusion where, as here, the existence of class-wide discrimination is not demonstrated. Rather, the district court must, on a case-by-case basis, determine whether the subjective criteria advanced by Harris–Teeter were in fact utilized in making the individual decision, or whether the individual decision was based upon unlawful discrimination.

720 F.2d at 339.

The district court responded to our remand in its judgment of October 10, 1986. *Lilly v. Harris–Teeter Supermarket*, 645 F.Supp. 1381 (W.D.N.C.1986). It again held that Harris–Teeter discriminated against the ten plaintiffs on account of their race in all of the thirty-odd promotion decisions they had challenged. Instead of undertaking a particularized reconsideration of the evidence, however, the court merely reproduced the findings and conclusions it had entered in its earlier opinions in the case. The court stated that the individualized review we requested "has already been done" and indicated that its earlier finding of class-wide discrimination in promotions "was a cumulative but not a necessary part of the original determination." *Id.* at 1388. The present appeal followed.

After a careful and individualized review of the record, we now affirm the district court's findings relating to most of the individual claims of nine of the ten plaintiffs. The findings as to these claims are sufficiently particularized, and they are supported by an adequate evidentiary basis. We reverse, however, the trial court's rulings as to the remaining claims of these nine plaintiffs, and as to all of the claims of plaintiff John LeGrand.

## II. Factual Background

### A. The Warehouse Environment

Nine of the ten plaintiffs in this case held rank-and-file manual labor positions at Harris–Teeter's warehouse between 1974 and

1978.[1] The warehouse served as Harris–Teeter's interim storage depot for food shipments arriving by truck or rail from the producers or manufacturers. At the time, Harris–Teeter operated fourteen retail supermarkets. The retail stores placed their food orders through the warehouse. The nine plaintiffs worked at various jobs in the receiving, order-filling, and shipping process. Harris–Teeter employed approximately two hundred workers at the warehouse.

Insofar as is pertinent here, labor at the warehouse was partitioned among five separate departments, each of which operated a night shift and a day shift. The five departments were "Grocery," "Produce," "Meat," "Frozen Foods," and "Buildings and Grounds." Each department occupied a separate location in the warehouse building. Pay scales for shift employees differed among the departments even though the workers' job titles were in many cases the same.

Teams of employees with varying job titles manned each shift in the five departments. With the exception of "Buildings and Grounds" personnel, the departmental shifts were generally composed of workers who either loaded or unloaded trucks and railroad cars (loaders and receivers), selected orders from the warehouse's stock (pickers), or operated forklifts moving food shipments to and from the loading docks (forklift drivers).[2] Depending on their individual departments, job titles, and levels of seniority, Harris–Teeter paid these workers hourly wages ranging between three and six dollars per hour.

The job title of "leadman" occupied the next rung on the warehouse employment hierarchy above most of these shift positions. Like their subordinates, leadmen were assigned on a departmental and shift basis. They had supervisory responsibility over shift personnel, but were also expected to perform general shift duties. They received hourly wages. The evidence indicates that Harris–Teeter employed a leadman to work in each of the five departments on the night shifts and in some of the departments on day shifts. Shift personnel promoted to leadmen positions received pay increases ranging from fifteen cents to one dollar per hour.

Beyond leadman, the next step in the job hierarchy was foreman, the first-level management position.[3] Although foremen were classified within the same departmental and shift subdivisions as the general shift personnel, they received annual salaries ranging from eleven to thirteen thousand dollars and were responsible to upper management for shift output. The foremen also had the initial responsibility of recommending shift personnel for pay raises, intra and intershift transfers to higher paying job titles, and for promotion to leadman when a vacancy arose.

The Director of Distribution was responsible for making all final promotion decisions at the warehouse. The evidence at trial was undisputed that when a leadman vacancy arose, the Director would ask the foreman of the particular shift and department wherein the vacancy existed and the supervisor of that department (the next rung on the management ladder above foreman) for recommendations on which employee was best qualified to fill it. Leadman vacancies were not posted in the warehouse, and management did not solicit applications from those interested in the position. Nor did Harris–Teeter utilize objective criteria in making leadman promotion decisions. Promotees were recommended by foremen and supervisors and chosen by the Director on the basis of subjective evaluations, which according to

---

1. The tenth plaintiff, Phillip Reed, was employed at one of Harris–Teeter's supermarkets. His claim is discussed separately *infra* at 1508–09.

2. Certain departments employed workers with other job titles according to the department's distinct needs.

3. There was evidence, however, that Harris–Teeter at times promoted or transferred leadmen to the temporary position of "foreman trainee." Foremen trainees performed essentially the same duties as leadmen without an increase in pay, but were being prepped for elevation to the salaried management position of foreman.

Harris–Teeter included initiative, capability, peer-respect, attitude, and the individual's desire to "get ahead."

Harris–Teeter also presented evidence that it followed an unwritten same shift/same department policy in filling vacant leadman positions. Its witnesses testified that the Company's policy was to search for a qualified individual then working in the same department and on the same shift where the lead position was open. Harris–Teeter would look to other shifts or other departments for eligible leadmen candidates only when a qualified person was not available within the same shift and department.[4] Once a person had been promoted to leadman, however, he could be promoted into a salaried management position (foreman) or transferred to a temporary foreman-trainee position across shift or departmental lines.

### B. The Plaintiffs' Claims

Seven of the ten plaintiffs (James Mobley, Roosevelt Patterson, Frank Sullivan, John LeGrand, Roy Torrence, Chris McKinney, and Ken Bailey) claimed that they were denied leadman, foreman, or foreman trainee promotions because of their race. Each of them had worked at the warehouse in a general shift position or positions (picker, loader, forklift driver, etc.) for a number of years. During their tenure, Harris–Teeter had promoted various less senior white employees to the challenged positions. Relying principally on their seniority and experience, they claimed they were better qualified than their white counterparts for the promotions in question.

Specifically, five plaintiffs (Mobley, Sullivan, McKinney, Torrence, and Bailey) claimed, *inter alia,* that they were discriminatorily denied leadman vacancies that occurred within the same shift and same department in which they had been working. Four plaintiffs (Mobley, Patterson, Sullivan, and LeGrand) also challenged leadman promotion decisions that would have re-

quired Harris–Teeter to transfer them across shift and departmental lines to fill the vacancy. These four contended that Harris–Teeter's same shift/same department policy was a pretext for discrimination because it had been applied inconsistently and along racial lines. Finally, three plaintiffs (Patterson, Torrence, and McKinney) challenged promotions that involved filling the management positions of foreman and foreman trainee.

The claims of plaintiffs Jerome Gary, Curtis Jones, and Phillip Reed were distinct from those of the seven others. Although they were also warehouse employees, Gary and Jones did not allege discrimination in the denial of a leadman or foreman position. Gary, a "stand-up" forklift driver, claimed that he was denied a transfer to a higher-paying position as a mechanic, which ultimately was filled by whites with less seniority. He also contended that race was the determining factor in Harris–Teeter's refusal to transfer him to a "sit-down" forklift. He was unable, however, to identify the persons who received the "sit-down" forklift positions. Jones claimed discriminatory denial of a transfer to a higher-paying position as rail-dock unloader. Harris–Teeter passed over Jones for this position in favor of newly hired white employees. Reed, a produce clerk employed in the Company's retail stores, claimed promotion discrimination outside of the warehouse. He contended that he should have received two promotions to produce manager that were filled by whites with less supervisory experience.

In defense to all of the plaintiffs' claims, Harris–Teeter presented evidence that its supervisors perceived the white promotees better qualified than the plaintiffs for the promotions in question. It admitted that many of the plaintiffs were not even considered for the promotions in question, but alleged that race played no part in its decision making.

---

**4.** For example, if a leadman vacancy occurred on the night shift in the Frozen–Food department, the Company claimed that its policy was to consider only the loaders, pickers, and fork-

lift drivers (and equivalent personnel) then working the night shift in Frozen Food to fill the position.

Harris–Teeter also raised its same shift/same department policy as a defense to the leadman-promotion claims to which it applied. Its warehouse supervisors testified that, because of the policy, they did not consider the plaintiffs who sought leadman promotions across shift and departmental lines. The Company produced uncontraverted proof that it filled nine out of ten challenged leadman vacancies with employees who had been working the same shift in the same department in which the vacancy arose.

### C.  The District Court's Holding

The district court rejected Harris–Teeter's defenses. It held that each of the ten plaintiffs established a prima facie case of race discrimination with respect to all of the promotion decisions they challenged, and it concluded that Harris–Teeter's articulated race-neutral bases for the decisions were unworthy of credence.

In particular, the court determined that Harris–Teeter's same shift/same department policy operated as an across-the-board pretext for race discrimination. It found that the policy had been inconsistently applied and it cited the absence of evidence showing that the policy had precluded white employees from crossing shift or departmental lines.

The trial court further found that the black employees were better qualified than their white counterparts for the promotions in question. It disbelieved the testimony of Harris–Teeter's supervisors that job performance and other race-neutral criteria were the determining factors for deciding which employees would be promoted, and concluded that race was the determining factor in all of the challenged promotions.

### III.  Analysis

### A.  The Same Shift/Same Department Policy

■ In its first contention on appeal, Harris–Teeter argues that the district court erred in striking down the Company's same

5. These reasons sparked the following conclusion of law:

shift/same department policy as an across-the-board pretext for racial discrimination. We agree. The evidence does not support the trial court's pretext conclusion, and its failure on remand to particularize its findings as to the policy's effect on individual claims missed the spirit of our mandate. We therefore reverse the court's discrimination findings as to plaintiff John Le-Grand, since all of his claims would have required the Company to violate its race-neutral leadman policy. We also reverse the court's findings as to those claims of plaintiffs, James Mobley, Roosevelt Patterson, and Frank Sullivan, which likewise would have required a transfer across shift or departmental lines.

(i)

The district court based its conclusion that the same shift/same department policy was pretextual on the following findings of fact entered in its 1982 opinion:

Whether this [same shift/same department] policy/practice existed during the time periods in question is in dispute. The policy was unwritten. If the policy existed, it was discriminatorily applied in that:

(i) there was no showing that any white person was denied a leadman position because of the practice; (ii) from the record evidence, only blacks were denied promotions because of the practice; (iii) the policy/practice was used to justify the denial of particular job assignments; (iv) white employees were promoted or transferred across shift and/or departmental lines to leadman or foreman trainee positions (Weaver, Fowlkes, Givens); (v) more experienced black employees, (Mobley, McKinney, Bailey) all of whom met the same shift/same department requirement, were denied leadman positions some of which were filled by whites who crossed shift and/or departmental lines to fill those positions.

*Lilly,* 545 F.Supp. at 691 (citations to the record omitted).[5]

Harris–Teeter advanced its "same shift/same department" policy as a reason for failing to promote various claimants. Said

Upon review of these findings under the clearly erroneous standard of Fed.R.Civ.P. 52(a), we are left with "the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

We have found no record evidence disputing the existence of the same shift/same department policy insofar as it applied to leadman vacancies. Harris–Teeter's supervisors testified that they attempted to fill lead positions from persons working the same shift and same department in which the vacancy arose. Nine of the ten challenged leadman promotions were filled in this manner. The plaintiffs presented no evidence contradicting the testimony of these Harris–Teeter witnesses and little independent proof that the policy was developed post-hoc to substantiate leadman promotion decisions.[6]

We next consider the trial court's stated bases for finding that Harris–Teeter applied the policy unevenly along racial lines. We pause briefly, however, to note that as in all "disparate treatment" cases,[7] Harris–Teeter's burden was simply to articulate a clear and reasonably specific non-discriminatory reason for denying the plaintiffs the promotions at issue. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254–55, 257–58, 101 S.Ct. 1089, 1094–95, 1096, 67 L.Ed.2d 607 (1981). Its same shift/same department policy satisfied that burden with respect to leadman promotions. The burden then shifted to plaintiffs to prove by preponderant evidence that the policy was "not the true reason for the employment decision[s]," *Id.* at 256, 101 S.Ct. at 1095. Although the trial court concluded that the plaintiffs satisfied this ultimate burden, the evidence it relied on does not support its conclusion.

The court reasoned that the policy was discriminatorily applied because of the *absence* of evidence that white employees had been denied intershift and interdepartmental leadman promotions. We agree that the evidence was lacking on this point, but its absence does not bridge the inferential gap to the conclusion that whites were granted such promotions. It was the plaintiffs' burden to fill the evidentiary void with sufficient proof of discriminatory application. They failed to do so.[8] The ab-

---

reason is pretextual. It is unworthy of credence. The policy was applied only to black employees. The testimony as to its scope was conflicting. The only persons denied promotions because of its application were blacks. This evidence showed that the practice had an adverse impact upon blacks and resulted in differential treatment for black employees (e.g. blacks could not cross shift/departmental lines, although whites did).

545 F.Supp. at 686.

**6.** The tenth promotion, that of Mike Weaver to leadman of the night shift in the Grocery Department, was filled across shift, but not departmental lines. Harris–Teeter maintained, however, that it chose Weaver after it found no one eligible for the position on the night shift, and that this was consistent with the policy.

Although we agree with the district court that Chris McKinney was discriminatorily denied the position Weaver received, *see infra* p. 1506, a single instance of discriminatory application does not raise a genuine issue of whether in fact the policy existed. On the other hand, Harris–Teeter's showing that it applied the policy consistently in nine out of the ten contested leadman promotions dispelled the plaintiffs' prima facie case and required the court, temporarily at least, to consider the policy as a legitimate,

nondiscriminatory reason for Harris–Teeter's action. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254–55, 101 S.Ct. 1089, 1094–95, 67 L.Ed.2d 207 (1981) (It is sufficient if the defendant's evidence raises a genuine issue of fact whether it discriminated against the plaintiff).

**7.** In our prior opinion in this case, we reversed the trial court's conclusion that Harris–Teeter engaged in a pattern or practice of racial discrimination in promotions. *Lilly*, 720 F.2d at 329, 338. Our remand was limited to the question whether any or all of the ten plaintiffs established intentional discrimination with respect to their individual claims. Our holding necessarily required the trial court to consider the evidence under the disparate treatment model fashioned in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

**8.** Our review, of course, is limited to the evidence of record, and the record in this case reveals that Harris–Teeter applied its policy consistently in nine out of the ten challenged promotions. Aside from the Weaver promotion, the plaintiffs presented no proof that the policy operated along racial lines.

sence of evidence relating to unchallenged leadman promotions cannot of itself support a finding that white employees generally were granted leadman promotions in violation of the same shift/same department policy.

The trial court's remaining reasons for striking Harris–Teeter's policy likewise fail for lack of a sufficient evidentiary basis. First, the court found "from the record evidence, only blacks were denied promotions because of the practice." The probativeness of this finding again rests on the unstated and unproved premise that whites were granted leadman promotions in violation of the policy. It was the plaintiffs' unfulfilled burden to show pretext through discriminatory application. In light of their failure to do so, it is not surprising that the record reflects that "only blacks" were denied promotions because of the practice.

The court next found that the policy was used to justify the denial of particular job assignments. Checking the court's citation to the record on this point, we find that the particular assignment to which the court referred was one the court found to be an intrashift/intradepartmental leadman promotion.[9]

The court also found that white employees, Fowlkes, Givens, and Weaver, "were promoted across shift and/or departmental lines to leadman or foreman trainee positions." Its references to the promotions of Fowlkes and Givens, however, do not support a finding of discriminatory application. Both crossed departmental lines only after they had attained lead positions. Harris–Teeter's witnesses explained that the same shift/same department policy was inapplicable to promotions beyond leadman. These assignments therefore were not inconsistent with Harris–Teeter's articulation of its policy. We have already noted the single conceded instance of inconsistent application with respect to Weaver. Whether race discrimination motivated that isolated decision is a question we resolve *infra* in deference to the trial court's credibility findings. Standing alone, it is insufficient to invalidate the same shift/same department policy on a class-wide basis.

Last, the court found that "more experienced black employees, (Mobley, McKinney, Bailey) all of whom met the same shift/same department requirement, were denied leadman positions some of which were filled by whites who crossed shift and/or departmental lines to fill those positions." While this finding tends to support the trial court's conclusion that the three named employees were discriminated against in intrashift/intradepartmental promotions, it sheds no additional light on whether the same shift/same department policy was pretextual. Of the three employees, only McKinney was denied a leadman promotion that was filled by a person who crossed shift lines to receive it. That person was Weaver. The record reflects that Harris–Teeter passed over the other two plaintiffs in favor of white employees

---

The record shows: 1) that Doug Dover was promoted from the position of picker on the night shift in the Produce department to leadman on the night shift in the Produce department; 2) that Terry Givens was promoted from the position of picker on the night shift in the Meat department to leadman on the night shift in the Meat department; 3) that Jeff Fowlkes was promoted from the position of picker on the night shift of the Produce department to leadman on the night shift in the Produce department; 4) that George Hamilton was promoted from the position of receiver on the day shift in the Meat department to leadman on the day shift in the Meat department; 5) that David Allison was promoted from the position of picker on the night shift in the Meat department to leadman on the night shift in the Meat department; 6) that Clyde Kiker was promoted from the position of picker on the night shift in the Produce department to leadman on the night shift in the Produce department; 7) that Earl Hanson was promoted from an undisclosed position on the night shift in the Buildings and Grounds department to leadman on the night shift in the Buildings and Grounds department; 8) that Wade Carpenter was promoted from the position of picker on the day shift in the Grocery department to leadman on the day shift in the Grocery department; and 9) that Richard McLain was promoted from the position of picker on the day shift in the Grocery department to leadman on the day shift in the Grocery department.

9. The plaintiff claiming discriminatory denial of that promotion (John LeGrand) worked in a different department.

who were then working the same shift in the same department in which the leadman vacancy arose.

In summary, the evidence so outweighs the plaintiffs' claims of discriminatory application that we cannot accept the district court's conclusion that the same shift/same department policy operated unevenly along racial lines or was otherwise a pretext for discriminatory treatment. To the extent that the court's conclusion rests on its decision to disbelieve Harris–Teeter's witnesses, the objective evidence refutes it, and we are left with the definite impression that the trial court was mistaken.[10] *See Anderson v. Bessemer City,* 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985) (a court of appeals may find clear error in a finding purportedly based on a credibility determination where documents or objective evidence contradict the credited testimony).

### (ii)

The district court's action with respect to the same shift/same department policy also violated the spirit of our remand. Our mandate directed the trial court to determine whether "any of the individual claims are made out in the absence of proof of class-wide discrimination." The court's original pretext conclusion was entered on a class-wide basis, and none of its individualized findings went beyond that flat holding. On remand, however, the court simply adopted these same findings as they appear in the Federal Supplement and incorporated them in unchanged form into its judgment. Satisfied that the case-by-case review we requested had already been done, it passed over the implications of our holding that class-wide discrimination had not been established. We have undertaken the careful review we requested of the trial court and conclude that the court's class-wide findings cannot stand.[11]

### B. Individual Claims

We turn next to the court's findings of discrimination regarding the claims that did not invoke the bar of the same shift/same department policy. The evidence underlying these findings consists principally of the plaintiffs' relative qualifications vis-a-vis their white counterparts who received the sought-after promotions. It established in most instances that the plaintiffs had greater seniority and more supervisory experience than the white employees who were promoted. Some had amassed supervisory experience at prior jobs, others had served as "fill-in" leadmen during their tenure at Harris–Teeter, most had held various job titles in the warehouse, and a few had been given the initial responsibility of training the white employees who surpassed them on the employment ladder. The evidence established to the district court's satisfaction that the black employees uniformly were better qualified than the white promotees.[12]

10. Our holding nullifies any award to plaintiff John LeGrand—since all of his claims would have required the Company to promote him to leadman across shift or departmental lines.

11. Our review leads us to the conclusion that a further remand would be unavailing. The plaintiffs had ample opportunity to produce evidence and create a record disclosing with particularity how Harris–Teeter's policy operated along racial lines to preclude them from obtaining the promotions they sought. They were unable to do so in a trial that lasted three months, and we have been provided nothing to indicate they would do so in further proceedings.

12. In *Patterson v. McLean Credit Union,* 805 F.2d 1143, 1147 (4th Cir.1986), *cert. granted,* —— U.S. ——, 108 S.Ct. 65, 98 L.Ed.2d 29 (1987), and *Young v. Lehman,* 748 F.2d 194, 198 (4th Cir. 1984), *cert. denied,* 471 U.S. 1061, 105 S.Ct. 2126, 85 L.Ed.2d 489 (1985), this court held that in Title VII and § 1981 cases where relative qualifications are advanced as the nondiscriminatory reason for an employment decision, the plaintiff has the burden of establishing she was better qualified than the successful applicant. The retained validity of that rule is not at issue in this case. Although the district court held that the plaintiffs were all better qualified than the successful white applicants, it also held that racial animus was the determining factor in Harris–Teeter's refusal to promote the plaintiffs. We agree with the large majority of its conclusions. In the few instances where we disagree, however, our decision rests on the complete absence of evidence regarding the successful applicants' qualifications *and* the plaintiffs' failure otherwise to show that race more likely than not motivated the individual promotion decisions.

The evidence further revealed well-settled indicia of an employment environment where race discrimination could flourish. Harris–Teeter considered only subjective criteria in making warehouse promotion decisions. Departmental supervisors testified that promotability depended on such intangibles as correct attitude and the desire to "get ahead." Seniority counted for little. Notices of job vacancies were not posted. Required qualifications for open positions were never communicated, and written guidelines not used. *See Wright v. Olin Corp.*, 697 F.2d 1172, 1181 (4th Cir. 1982) ("[s]ubjective ratings systems have a clear potential for abuse and may hide race or sex discrimination."); *Brown v. Gaston County Dyeing Machine Co.*, 457 F.2d 1377, 1383 (4th Cir.), *cert. denied*, 409 U.S. 982, 93 S.Ct. 319, 34 L.Ed.2d 246 (1972) ("lack of objective guidelines for ... promotion and the failure to post notices of job vacancies are badges of discrimination"); *Davis v. Richmond, Fredericksburg & Potomac R.R. Co.*, 593 F.Supp. 271, 281 (E.D. Va.1984), *aff'd in relevant part*, 803 F.2d 1322 (4th Cir.1986) (employer's practices including, lack of official application form, exclusive reliance on word-of-mouth to fill job positions, failure to specify guidelines for hiring or promotion, and reliance on supervisors' discretion, all contributed to disparate treatment conclusion).

In view of this undisputed evidence, the district court was bound to scrutinize "particularly closely" Harris–Teeter's alleged nondiscriminatory reasons for not promoting the plaintiffs. *Page v. Bolger*, 645 F.2d 227, 230 (4th Cir.) (en banc), *cert. denied*, 454 U.S. 892, 102 S.Ct. 388, 70 L.Ed.2d 206 (1981). It rejected as pretext the Company's principal assertion that it perceived the white promotees better qualified than the black plaintiffs, and held that race was the determining factor in each adverse promotion decision.

On appeal, Harris–Teeter contends that the district court improperly substituted its business judgment of the plaintiffs' qualifications for that of the Company. We cannot accept that argument. The district court based its judgment in large part on its view of the credibility of the witnesses. The court's ruling reflects its answer to the question whether the Company sincerely acted on its asserted belief that the promotees were better qualified than the plaintiffs for the promotions in question. It held that the Company's explanation was unworthy of credence and that a discriminatory reason more likely than not motivated Harris–Teeter, regardless of its claimed beliefs. *See Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095; *see also U.S. Postal Service Bd. of Govs. v. Aikens*, 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983); *id.* at 717–18, 103 S.Ct. at 1482–83 (Blackmun, J., concurring).

The clearly erroneous standard of Rule 52(a) insulates the vast majority of the court's conclusions from disturbance on appeal.[13] With the exception of the previously discussed intershift/interdepartmental leadman promotion claims and a few others specifically discussed below, we must affirm its rulings. Mindful of Justice Powell's *Bessemer City* admonition, however, *Bessemer City*, 470 U.S. at 581, 105 S.Ct. at 1515 (Powell, J., concurring), we reach this conclusion only after careful review of each individual claim.

*Chris McKinney*

Plaintiff Chris McKinney had been employed in night shift/Grocery since June 1975. The Company was aware he had two-and-a-half years additional prior experience supervising six employees. In the Spring of 1977, however, it promoted Mike Weaver, a white in day shift/Grocery across shift lines to leadman in night

13. "[W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." *Bessemer City*, 470 U.S. at 575, 105 S.Ct. at 1512. Similarly, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous," and "[t]his is so even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts." *Id.* at 574, 105 S.Ct. at 1511.

shift/Grocery. Weaver had been hired to an entry level position only six months earlier. The district court found that Harris–Teeter did not consider McKinney for the position on account of his race.

Harris–Teeter argues that McKinney was lazy, a poor worker, and had personal hygiene problems. The district court rejected this argument as pretext. Although warnings were given other employees, Harris–Teeter presented no evidence that McKinney had ever been formally notified of his asserted inadequacies. The district court was not clearly erroneous in holding that Harris–Teeter denied McKinney Weaver's position because of his race.

### James Mobley

■ Plaintiff James Mobley had been employed in night shift/Meat since April 1974. He was a high school graduate and he had attended college. Mobley had prior experience in production and factory work. While at Harris–Teeter, he received two salary increase recommendations for job performance, attendance, and attitude. He served as fill-in leadman on a number of occasions. In the Spring of 1976, Terry Givens, a white with less seniority than Mobley, was promoted to leadman in night shift/Meat. Givens, a high-school dropout, listed his only prior experience as machine operator. Mobley supervised Givens during the former's stints as fill-in leadman. Harris–Teeter, however, did not consider Mobley for the promotion. The district court rejected as pretext the Company's defense that Givens possessed superior qualifications. The court's finding was not clearly erroneous.

■ We reverse, however, the district court's finding that Harris–Teeter discriminated against Mobley in the May 1977 leadman promotion of David Allison. Mobley was on strike at the time of the promotion. He offered to return to work in February 1977 but did not actually return until July 1977. Harris–Teeter claims that its policy was not to reinstate strikers until replacement workers departed and that, therefore,

Mobley's willingness to return to work at the time of Allison's promotion was not relevant. Beyond merely stating that this rationale is pretext, the district court advanced no basis upon which to conclude that the policy not to substitute strikers for replacement workers until the latter departed was in fact a front for racial discrimination. We see nothing in the record to indicate that the policy was pretextual. Nor do plaintiffs cite any white exceptions to this rule. We therefore hold that the district court's finding respecting Allison's promotion over Mobley was clearly erroneous.

### Frank Sullivan

■ Plaintiff Frank Sullivan began work at Harris–Teeter in 1969. He worked in several departments, but spent most of his time in the Meat Department. He was a high school graduate and he attended college for one year. In 1973, Sullivan was promoted to leadman, but was returned to a rank and file position after marital difficulties caused him to opt out of a foreman-trainee program. More than three years later, Harris–Teeter promoted Curtis George Hamilton, a white high-school dropout with over one year less seniority than Sullivan, to leadman on Sullivan's day shift. The district court rejected as pretext Harris–Teeter's defenses that Hamilton possessed superior qualifications and that Sullivan two years earlier indicated an unwillingness to work night shifts. The court was not clearly erroneous in these findings.

### Roy Torrence

■ Plaintiff Roy Torrence began work in night shift/Building and Grounds (Sanitation) in 1974. He received steady pay increases and was cited for excellent attendance and job performance. In 1975 Torrence requested a promotion to foreman. His supervisor told him that he would never be promoted to foreman or leadman as long as the supervisor was present.[14] Later that year, Harris–Teeter hired Neal Mitchell (white) into the Build-

---

**14.** Although the supervisor denied making this comment, the district court resolved the credi-

bility issue in Torrence's favor. Rule 52(a) requires us to accept the court's finding.

ing and Grounds Department. Torrence was given the responsibility of training Mitchell. One month after his initial hiring Mitchell was promoted to foreman. Torrence remained at his rank and file position. More than three years later, Harris–Teeter promoted Earl Hanson, a white with over three years less seniority than Torrence, to leadman on Torrence's shift. Torrence was not considered for either the foreman or the leadman positions. The district court rejected the testimony of Harris–Teeter's witnesses that Torrence was considered a poor or average employee. This evidence conflicted with documentary evaluations of Torrence's superior performance. The court was not clearly erroneous in finding that the Company refused to consider Torrence for these positions because of his race.

### Kenneth Bailey

■ Plaintiff Kenneth Bailey began work at the warehouse in the Grocery Department in April 1974. Bailey was a high school graduate and had attended three years of college. He worked various positions at the warehouse, including stacker, forklift driver, picker, and loader, between 1974 and 1977. In 1978, Harris–Teeter promoted Wade Carpenter, a white with over two years less seniority than Bailey, to leadman on Bailey's shift. Carpenter had experience only as a picker. After Carpenter's resignation one year later, Harris–Teeter again skipped over Bailey, promoting a less-senior picker, Richard McClain (also white), to leadman instead.

The district court rejected as pretext the Company's argument that Bailey's experience as stacker, forklift driver, and loader did not qualify him for leadman of the Grocery Department. Conceding it had not considered Bailey for either promotion, Harris–Teeter maintained that experience as a picker was the only relevant qualification for the lead Grocery position. Bailey testified, however, that as loader he had supervisory responsibility over pickers to ensure that they selected the correct merchandise and stacked it properly. Moreover, loaders and forklift drivers received higher hourly wages than pickers. Finally,

Bailey testified that Grocery leadmen supervised all employees in the department, not just pickers. The district court's discrimination findings are not clearly erroneous.

### Jerome Gary

■ Plaintiff Jerome Gary applied for a mechanic's position at Harris–Teeter in 1974. After graduating from high school, Gary received certificates for two years vocational training in auto mechanics and auto body repair. He also had three months cooperative training at an automobile dealership. When the Company informed him that there were no present openings at its garage, Gary accepted a position as a "stand-up" forklift driver. Thereafter, Gary repeatedly requested transfers to the garage. His supervisor responded that although he thought Gary qualified for such a transfer, no openings were available. At trial, however, Gary presented evidence that harris–Teeter hired or transferred numerous white employees to the garage during the period of Gary's requests. In contrast, the Company offered no explanation for its failure to consider Gary for these garage positions, and the district court concluded that race was the determining factor. Its conclusion is not clearly erroneous.

■ We reverse, however, the trial court's holding that Gary was discriminatorily denied a transfer to a higher-paying position as "sit-down" forklift driver. Gary contended that he was denied this position, but could not identify the white employees who received it or the dates they were promoted. No further evidence was presented in support of this claim. Without any indication of the transferees' identity, seniority, training, experience, qualifications, or dates of transfer, Gary's bare contentions simply cannot stand as proof of race discrimination.

### Curtis Jones

■ Plaintiff Curtis Jones, a Harris–Teeter employee since 1974, requested and was denied a transfer in 1976 to a higher-

paying position as a rail-dock unloader. Harris–Teeter hired whites, James Lamb and Eddie Kistler, to the rail dock position instead. Neither had any Company experience. The trial court did not believe testimony that Jones' history of back troubles disqualified him from the rail dock, since the Harris–Teeter supervisors who denied his transfer failed to inquire into Jones' back problem and Jones testified that his back problem was minor. The court's finding contains no clear error. Not only did the supervisor fail to ask Jones about his back, but the evidence indicates that the average amount of lifting required of rail-dock unloaders was the same as that required of salvage-dock unloaders. Harris–Teeter transferred Jones to the salvage dock in 1979. We affirm the trial court's finding of race discrimination with respect to the positions Lamb and Kistler received.

The trial court, however, erred in its 1980 finding that Jones was entitled to a rail dock position given to Neal Mitchell. It is undisputed that Mitchell never worked on the rail dock.

### Phillip Reed

■ The district court found that plaintiff Phillip Reed, a produce clerk in Harris–Teeter's retail stores, was discriminatorily denied promotions to the position of produce manager, which went to white employees, Andy Wilson and Warren Allen. Reed had over three years grocery-store management experience prior to coming to Harris-Teeter. Although there was no showing that Wilson had any comparable prior experience, Harris-Teeter maintained that it did not consider Reed for the promotion Wilson received because Reed was not then working in the store where the vacancy arose. After Wilson left the job, however, the Company transferred Allen from another store to take Wilson's place.[15] Harris-Teeter attempted to justify Allen's

promotion by reference to Reed's allegedly poor performance working under Wilson. The trial court found this asserted justification unworthy of credence. It noted that during the year in which Harris-Teeter denied Reed these promotions, the Company promoted 104 whites and only four blacks to store management positions. It also found that the Company did not consider Reed's prior supervisory experience. Harris–Teeter does not challenge these latter findings, but argues that the trial court improperly substituted its judgment of Reed's qualifications. We disagree. The court's conclusion that Reed was discriminated against on account of his race is not clearly erroneous.

### Roosevelt Patterson

■ The district court held that plaintiff Roosevelt Patterson had been the victim of discrimination in numerous promotion decisions.[16] Patterson had worked at various jobs within the warehouse from 1971 onward. At one point, the Company ordered Patterson to man a receiving job single-handedly that ordinarily was performed by two employees. Patterson had substantially more seniority than all of the white employees whose promotions he challenged.

In its 1986 judgment, the court incorporated by reference its previous findings that Patterson was discriminatorily denied foreman positions that went to whites, Jeff Fowlkes, Terry Givens, David Allison, Clyde Kiker, and Neal Mitchell.[17] These foreman promotions involved departments other than that in which Patterson was working, but as we have said, Harris-Teeter's same shift/same department policy did not apply to management positions. Harris-Teeter, however, also articulated in defense to Patterson's claims that only leadmen (or foreman trainees) were eligible for foreman promotions. This explanation was

15. Reed had transferred to Wilson's store prior to Wilson's departure and Allen's transfer.

16. All of the leadman promotions Patterson challenged would have required the Company to transfer him across shift or departmental lines. For the reasons given *supra* pp. 1502–05, we must reverse the trial court's findings that Pat-

terson was not promoted to these lead positions because of his race.

17. It also held that Patterson was entitled to a foreman trainee promotion that Fowlkes received.

demonstrably pretextual. Employee John Watson was directly hired into a foreman position. Neal Mitchell was promoted to foreman of Buildings and Grounds after being hired to an entry level position only one month earlier. Another white employee (Henry Richard Jackson) was hired directly into a foreman trainee position, and another (Curtis George Hamilton) was promoted to foreman only three weeks after his promotion to leadman.[18] The district court held that Patterson was not considered for these foreman openings because of his race. Its conclusion is not clearly erroneous.

### C. Summary of Holdings

To summarize, we affirm all of the district court's discrimination findings with the exception of those to which the same shift/same department leadman policy applied and those individual claims of plaintiffs Gary and Jones that we have discussed above. We affirm: (1) the intrashift/intradepartmental leadman claims of Chris McKinney, James Mobley, Frank Sullivan, Roy Torrence, and Kenneth Bailey; (2) the foreman claims of Roy Torrence and Roosevelt Patterson; (3) the rail dock claims of Curtis Jones for the positions filled by Lamb and Kistler; (4) the garage transfer claims of Jerome Gary; and, (5) the produce manager claims of Phillip Reed. We reverse: (1) the "sit-down" forklift claim of Jerome Gary; (2) the rail dock claim of Curtis Jones for the position allegedly filled by Neal Mitchell; (3) the intershift/interdepartmental leadman claims of John LeGrand, James Mobley, Roosevelt Patterson, and Frank Sullivan;[19] and, (4) the May 1977 leadman promotion claim of James Mobley.

### IV. Attorney's Fees

This court's 1983 decision vacated the award of attorneys' fees to the plaintiffs and remanded the issue to the district court for recalculation in light of our reversal of the claim of class-wide discrimination in promotions. We advised the court to decide "what effect, if any, these changes in the ultimate result of the case should have upon the amount of the award." *Lilly*, 720 F.2d at 339. On remand, the district court responded that "there does not appear to be any occasion to change the previous judgment, as far as it goes, with regard to attorney fees." *Lilly*, 645 F.Supp. at 1388.

In fixing the previous award, the trial court had followed the procedure outlined by this circuit in *Anderson v. Morris*, 658 F.2d 246 (4th Cir.1981). The court determined the number of hours worked by the plaintiffs' lawyers, and then determined their customary hourly rate. These numbers were multiplied to obtain the "lodestar" figure of $65,512, to which the court added paralegal and other expenses. This was a correct application of factors one and five of the twelve fee-award factors set forth in *Johnson v. Georgia Highway Express*, 488 F.2d 714, 717–19 (5th Cir.1974) (adopted by this circuit in *Barber v. Kimbrell's*, 577 F.2d 216 (4th Cir.1978)). The next step under *Johnson* was to consider adjusting the lodestar figure in light of the other ten *Johnson* factors, which include skill required, complexity of the case, and results obtained. *Anderson v. Morris*, 658 F.2d at 249. The trial court, in fixing its interim award, had reserved ruling on this upward adjustment, but had entered interim findings on the other ten *Johnson* factors.

---

**18.** Although unclear on the point, the record also suggests that Patterson's principal supervisor at Harris–Teeter (Dwight Johnson) was promoted to foreman without first holding a leadman position.

Harris–Teeter disingenuously continues to advance this foreman-promotion rule on appeal: "Patterson was not a leadman and, therefore, not even eligible for such promotions." Appellant's Brief at 18. The record, however, clearly exposes the pretextual nature of the rule.

**19.** As we have stated, our reversal of the district court's holding on the same shift/same department policy disposes of all the claims of John LeGrand. Plaintiffs Mobley, Patterson and Sullivan, however, brought other claims which survive our conclusion that the evidence does not support the trial court's finding that Harris–Teeter's leadman policy was pretextual.

The proper method for determining attorney fee awards under the Civil Rights Attorney's Fees Awards Act, of course, has changed since the district court entered its interim award in 1982. In 1984, the Supreme Court suggested that most of the *Johnson* factors should be considered in arriving at the proper hourly rate for the lodestar calculation, instead of using them to figure an adjustment to the product. *See Blum v. Stenson,* 465 U.S. 886, 896–901, 104 S.Ct. 1541, 1547–50, 79 L.Ed.2d 891 (1984). We explained the ramifications of *Blum* in our decision in *Daly v. Hill,* 790 F.2d 1071 (4th Cir.1986): *"Blum* has shifted the timing of the *Johnson* analysis, as it has been applied in this circuit. The proper point at which the *Johnson* factors are to be considered is in determining the reasonable rate and the reasonable hours ... the lodestar fee is now the proper focus of the entire *Johnson* analysis in most cases." *Id.* at 1078; *see also Pennsylvania v. Del. Valley Citizens Council,* 478 U.S. 546, 106 S.Ct. 3088, 3098–99, 92 L.Ed.2d 439 (1986) ("the lodestar factor includes most, if not all, of the relevant factors comprising a 'reasonable' attorney's fee").

In addition, the "results obtained" factor has since received special emphasis from the Supreme Court:

> This factor is particularly crucial where a plaintiff is deemed "prevailing" even though he succeeded on only some of his claims for relief. In this situation two questions must be addressed. First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?
>
> ....
>
> If, on the other hand, a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount. This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith. Congress has not authorized an award of fees whenever it was reasonable for a plaintiff to bring a lawsuit or whenever conscientious counsel tried the case with devotion and skill. Again, the most critical factor is the degree of success obtained.
>
> ....
>
> It remains important ... for the district court to provide a concise but clear explanation of its reasons for the fee award. When an adjustment is requested on the basis of either the exceptional or limited nature of the relief obtained by the plaintiff, the district court should make clear that it has considered the relationship between the amount of the fee awarded and the results obtained.

*Hensley v. Eckerhart,* 461 U.S. 424, 434, 436, 437, 103 S.Ct. 1933, 1940, 1941, 76 L.Ed.2d 40 (1983). On remand, the attorneys' fees award should be recalculated in light of the above principles.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.